UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| DEBORAH WALTON, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| vs. | ) ) | Cause No. 1:16-cv-3302-WTL-DLP |
| BMO HARRIS BANK, *et al.*, | ) ) ) |  |
| Defendants. | ) |  |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the motions for summary judgment filed by the Plaintiff Deborah Walton (Dkt. Nos. 100 and 104), Defendant BMO Harris Bank, N.A. ("BMO") (Dkt. No. 57) and Defendant Equifax Information Services LLC ("Equifax") (Dkt. No. 111). The motions are fully briefed and the Court, being duly advised, **GRANTS** the Defendants' motions and **DENIES** the Plaintiff's motions for the reasons set forth below.[1]

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there

---

[1] The Plaintiff is proceeding *pro se* in this case and was provided with the notice required by Local Rule 56-1(k).

is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

When the Court reviews cross-motions for summary judgment, as is the case here, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted). "'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

## II. FACTUAL BACKGROUND[2]

In April 2006, the Plaintiff entered into a Home Equity Loan (the "Loan") with First Indiana Bank. The Loan was secured by a second mortgage on the Plaintiff's property at 12878 Mayfair Lane, Carmel, Indiana, 46032. First Indiana Bank merged with M&I Bank, and M&I Bank subsequently merged with the Defendant BMO, who acquired the Plaintiff's Loan.

The Loan has a twenty year term, maturing in April 2026. The Loan's term is split between a Draw Period and a Repayment Period. During the Draw Period, which compromises the first ten years of the Loan, the Plaintiff could access the Loan as a revolving line of credit. During the Draw Period, the Plaintiff was responsible for paying the accrued interest and any credit insurance premium.

---

[2] The Plaintiff has made numerous filings related to the motions for summary judgment currently before the Court, and has not always used the clearest citations. The Court has endeavored to consider all the evidence and arguments presented by the Plaintiff.

In April 2016, the Loan shifted from the Draw Period to the Repayment Period. During the Repayment Period, the Plaintiff was responsible for making monthly payments on the Loan. The parties dispute whether the Plaintiff made all of the required payments. Following the shift from the Draw Period to the Repayment Period, BMO received seven Automated Credit Dispute Verifications ("ACDV") from credit reporting agencies ("CRA") regarding the Loan, which were triggered by the Plaintiff disputing the information which BMO had reported. BMO investigated and responded to each ACDV:

- On August 30, 2016, BMO received an ACDV from Trans Union; BMO investigated the dispute and responded to Trans Union on September 19, 2016.

- On August 30, 2016, BMO received an ACDV from Equifax; BMO investigated the dispute and responded to Equifax on September 16, 2016.

- On October 13, 2016, BMO received an ACDV from Experian; BMO investigated the dispute and responded to Experian on October 25, 2016.

- On November 7, 2016, BMO received another ACDV from Experian; BMO reinvestigated the dispute and responded to Experian on November 29, 2016.

- On December 6, 2016, BMO received another ACDV from Equifax; BMO reinvestigated the dispute and responded to Equifax on December 22, 2016.

- On December 6, 2016, BMO received another ACDV from Experian; BMO reinvestigated the dispute and responded to Experian on December 19, 2016.

- On July 13, 2017, BMO received another ACDV from Equifax; BMO reinvestigated the dispute and responded to Equifax on August 1, 2017.

Upon receipt of each of these ACDVs, in which the Plaintiff alleged that BMO inaccurately reported the Loan, BMO reviewed its records for the Loan, including the Plaintiff's repayment history, and compared that history to BMO's reporting of the Loan to the CRAs.

BMO contends that the Plaintiff stopped making payments on the Loan, and concluded that its reporting regarding the Loan was accurate.[3]

Defendant Equifax is a CRA to which BMO reports regarding its account with the Plaintiff ("Account"). Equifax maintains detailed policies and procedures designed to ensure that it conducts reasonable reinvestigations of information disputed by consumers as inaccurate. A consumer may contact Equifax to request a consumer disclosure or dispute information reported in his or her credit file by telephone, mail, or through an Internet portal on Equifax's website.

When Equifax receives a dispute, it assigns each dispute a unique confirmation number. Equifax's records show that it was contacted by the Plaintiff three times regarding the Account. On August 30, 2016, the Plaintiff called Equifax to dispute information in Equifax's credit files regarding the Account. The unique confirmation number associated with this dispute is 6243018446. The Plaintiff did not provide Equifax with any documents or any other information. Equifax began its reinvestigation procedures with respect to the Plaintiff's dispute. On August 30, 2016, as part of its reinvestigation, Equifax sent an ACDV to BMO to request verification of the Account.

According to Equifax's records, on September 8, 2016, the Plaintiff called Equifax to cancel the reinvestigation arising out of her August 30, 2016, dispute of the information in Equifax's credit files regarding the Account. Per the Plaintiff's request, Equifax cancelled the reinvestigation. Equifax sent a letter to the Plaintiff confirming that it canceled the

---

[3] The Plaintiff argues BMO's reporting could not have been accurate because BMO has "no clue of what the new monthly scheduled payments should be." Dkt. No. 116 at 5. In support of this proposition, the Plaintiff cites her own affidavit, Dkt. No. 117-1, and the deposition testimony of Dan Gallagher, Dkt. No. 101 at 60-65. Neither piece of evidence supports the allegation that BMO did not know what the scheduled payments should have been.

reinvestigation. Because, according to Equifax, the September 8, 2016, call related to the August 30, 2016, call, the same confirmation number was used. The Plaintiff asserts that she did not request that the reinvestigation be cancelled.

On December 6, 2016, the Plaintiff called Equifax to dispute information in Equifax's credit files regarding the Account. The unique confirmation number associated with this dispute is 6341025029. The Plaintiff did not provide Equifax with any documents or any other information.[4]

Other than the communications on these three dates, Equifax has no record of any other communications from the Plaintiff disputing information contained in the Account prior to the Plaintiff filing this lawsuit.[5]

---

[4] The Plaintiff argues that Equifax acted unreasonably because Equifax reported different numbers on a "September 1, 2016 ACDV" and a "September 8, 2016 credit report." Dkt. No. 129 at 3-4. However, as Equifax notes, the September 1, 2016, ACDV is actually one page from a larger document created on December 6, 2016. *Compare* Dkt. No. 130 at 43 and Dkt. No. 112-2 at 4. Furthermore, the fact that the numbers are different does not mean that Equifax's reinvestigation was not reasonable.

[5] The Plaintiff contends that she lodged eight disputes with Equifax, as opposed to two. Equifax provides details of each of these additional contacts with the Plaintiff:

- On July 28, 2016, Equifax received a phone call from the Plaintiff. The unique confirmation number for this contact is 6210044760. This communication is reflected in Equifax's documents produced as EIS-WALTON-000702-00719. In this phone call, the Plaintiff asked Equifax to lift the security freeze on her file. The Plaintiff provided the correct PIN and pursuant to her request, Equifax lifted her security freeze from July 28, 2016, to July 29, 2016.

- On July 29, 2016, Equifax received another phone call from the Plaintiff. The unique confirmation number for this contact is 6211026172. This communication is reflected in Equifax's documents produced as EIS-WALTON-000720-000750. In this phone call, the Plaintiff requested reinstatement of the security freeze. Equifax reinstated the security freeze per the Plaintiff's request.

- On July 29, 2016, Equifax received a phone call from the Plaintiff. The unique confirmation number for this contact is 6211010994. This communication is reflected in Equifax's documents produced as EIS-WALTON-000751-000770. In this phone call the

Upon receipt of a dispute, and after locating the consumer's credit file, Equifax opens an Automated Consumer Interview System ("ACIS") case that tracks the process of the reinvestigation. Equifax then reviews and considers all relevant information including documentation, if any, provided by the consumer and reviews the contents of the consumer's credit file. If Equifax is able to make updates based on the information it has, it will do so.

If further investigation is required, Equifax notifies the source of the account information (referred to as the "furnisher") of the consumer's dispute, identifies the nature of the consumer's dispute, and includes the consumer's account information as it then appears in Equifax's credit file. These communications are generally made through a process wherein Equifax transmits an ACDV by electronic mail. The ACDV electronic mail process allows CRAs to communicate with furnishers through use of an array of pre-defined codes and narrative phrases. This

---

Plaintiff disputed a former address: 4220 Broadway St., Indianapolis, IN 46205. This address was suppressed per the Plaintiff's request.

- On August 18, 2016, Equifax received a phone call from the Plaintiff. The unique confirmation number for this contact is 6231064086. This communication is reflected in Equifax's documents produced as EIS-WALTON-000771-000791. In this phone call the Plaintiff called with questions about how long inquiries would remain on her file. Equifax answered the Plaintiff's questions.

- On August 24, 2016, Equifax received a phone call from the Plaintiff. The unique confirmation number for this contact is 6237030118. This communication is reflected in Equifax's documents produced as EIS-WALTON-000792-000820. In this phone call the Plaintiff asked Equifax to lift the security freeze on her file. The Plaintiff provided the correct PIN and pursuant to her request, Equifax lifted her security freeze from August 24, 2016, to August 25, 2016.

- On August 24, 2016, Equifax received a phone call from the Plaintiff. The unique confirmation number for this contact is 6237038612. This communication is reflected in Equifax's documents produced as EIS-WALTON-000821-000849. In this phone call the Plaintiff requested reinstatement of the security freeze. Equifax reinstated the security freeze per the Plaintiff's request.

None of these additional contacts involve disputing information in the Account.

standardized process enhances consistency and reduces misunderstandings, which otherwise would be significant given the large number of disputes processed by Equifax every day.

When the furnisher receives the dispute from Equifax, it is generally required, both by its contract with Equifax and by the Fair Credit Reporting Act ("FCRA"), to conduct its own investigation and report the results back to Equifax. If the furnisher advises Equifax to delete or otherwise update the account information, then Equifax takes the necessary action and notifies the consumer. Upon completion of the reinvestigation, Equifax sends the consumer the results along with a summary of the consumer's rights under the FCRA, additional steps the consumer may take, and a description of the procedures used to reinvestigate the dispute.

The individuals who handle consumer disputes must undergo a training process whereby they are trained on the reinvestigation policies and procedures created by Equifax. To begin, the individuals must participate in classroom instruction. Upon completion of the classroom instruction, each participant is required to pass a competency test. A participant who achieves a passing grade subsequently receives on-the-job training.

Equifax followed its reinvestigation procedures with respect to the Plaintiff's disputes. On December 6, 2016, as part of its reinvestigation, Equifax sent an ACDV to BMO. The ACDV provided two reasons for the dispute: (1) "Dispute 1 [053] CONSUMER STATES INACCURATE INFORMATION. VERIFY COMPLETE ID AND ACCOUNT INFORMATION"; and (2) "Dispute 2 [007] DISPUTES CURRENT/PREVIOUS ACCOUNT STATUS/PAYMENT HISTORY PROFILE/PAYMENT RATING. VERIFY PAYMENT HISTORY PROFILE ACCOUNT STATUS, AND PAYMENT RAT [sic]." In the ACDV, Equifax provided further information concerning the Plaintiff's dispute in the free-form "FCRA Relevant Information" field: "CONSUMER STATES THAT THIS ACCOUNT WAS AN

INSTALLMENT ACCOUNT NOT A REVOLVING ACCOUNT AND IT HAS NEVER BEEEN [sic] LATE."

On December 22, 2016, Equifax received a response to the ACDV from BMO confirming that the Account belonged to the Plaintiff and that the date of first delinquency occurred in August 2016, but modifying *inter alia* the Current Balance field from "$68015" to "$67627" and the Past Due field from "$3410" to "$3693." The ACDV reflects that BMO's employee, Brian Rathmann, prepared BMO's response. On December 23, 2016, Equifax provided its reinvestigation results to the Plaintiff.

Equifax did not prepare any consumer reports concerning the Plaintiff from, and including, August 30, 2016, when the Plaintiff made her initial dispute, through January 30, 2018.[6]

### III. DISCUSSION

The dispute between the Plaintiff and BMO stems from the shift from the Draw Period to the Repayment Period, as the Plaintiff disputes the accuracy of the Loan statements BMO sent when the Repayment Period began and its response to her complaints about the statements. Likewise, the Plaintiff disputes the propriety of Equifax's reporting and its investigation of her claims regarding her Account with BMO.

---

[6] The Plaintiff disputes this fact by citing two reports sent to the Plaintiff on September 3, 2016, and December 19, 2016, as well as reports sent to third parties on July 16, 2016 (two reports), August 23, 2018 (three reports), and August 24, 2016 (one report). However, the evidence presented by the Plaintiff establishes that the August 23, 2018, reports were actually issued on August 23, 2016, Dkt. No. 130 at 11, leaving no consumer report issued after the Plaintiff's dispute. *See Wantz v. Experian Info. Servs.*, 386 F.3d 829, 834 (7th Cir. 2004) ("[W]here there is no evidence of disclosure to a third party, the plaintiff cannot establish the existence of a consumer report."), *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).

The Plaintiff filed her complaint against the Defendants on December 7, 2016, asserting violations of the FCRA, the Real Estate Settlement Procedures Act ("RESPA"), and the "General Business Law." On July 17, 2017, Defendant BMO filed a motion to dismiss, and the Plaintiff subsequently moved to amend/correct her Complaint. Dkt. Nos. 27 and 37. On January 12, 2018, the Court issued its order on BMO's motion to dismiss and the Plaintiff's motions to amend, granting the motions to amend and dismissing two of the six counts asserted in the Amended Complaint. Dkt. No. 87. Of the six claims asserted in the Amended Complaint, Counts II and III asserting violations of the FCRA against Equifax, and Counts V and VI, asserting violations of the FCRA and RESPA against BMO, remain before the Court. The Plaintiff and the respective Defendants have moved for summary judgment on each count.

### A. Claims Against Equifax

*1. Counts II and III (Violations of the FCRA, 15 U.S.C. § 1681e(b) & 15 U.S.C. § 1681i)*

To prevail on a claim brought under 15 U.S.C. §§ 1681e(b) or 1681i, the Plaintiff must show that a consumer report (15 U.S.C. §§ 1681e(b)) or her credit file (15 U.S.C. §§ 1681i) contained an inaccuracy stemming from Defendant Equifax's failure to follow reasonable procedures, and that this failure caused the Plaintiff to suffer damages. *Ruffin-Thomkins v. Experian Info. Solutions*, 422 F.3d 603, 608 (7th Cir. 2005); *Sarver v. Experian Info. Solutions, Inc.*, 390 F.3d 969, 971-72 (7th Cir. 2004). In addition, the Plaintiff seeks punitive damages under 15 U.S.C. § 1681n, which requires willful noncompliance with the FCRA. Both of the Plaintiff's claims against Equifax fail because she has failed to point to evidence from which a reasonable factfinder could conclude that Equifax reported inaccurate information or that the Plaintiff suffered any damages.

In order to survive Equifax's motion for summary judgment, the Plaintiff "must sufficiently [point to evidence] that a credit reporting agency prepared a report containing

inaccurate information." *Sarver*, 390 F.3d at 971 (internal citations and quotation marks omitted). The Plaintiff repeatedly cites the deposition testimony of Melody Creswell regarding negative reporting on the Plaintiff's credit, Dkt. No. 106-2, the deposition testimony of Dan Gallagher regarding the specific terms of the loan, Dkt. No. 101, and the Loan document itself, Dkt. No. 124, in an attempt to show that Equifax reported inaccurate information, but the evidence cited does not support that allegation. Likewise, the Plaintiff asserts that "[i]f Equifax had reviewed the current balance, actual payment, and amount past due on the AUD's issued to all the credit bureaus on November 8, 2016 and November 29, 2016, they should have realized that BMO Harris Bank was furnishing inaccurate information." Dkt. No. 129 at 7. Her contention seems to be based upon certain Automated Universal Dataforms ("AUD") and an ACDV, but these documents do not establish an inaccuracy. Dkt. Nos. 135 &136. Rather, the Plaintiff seems to argue that the fact that Equifax reported negative information, which also may have varied depending on the time of the report, demonstrates that Equifax provided inaccurate information. It does not.

Furthermore, even if this were not the case, the Plaintiff has failed to point to evidence that could establish that she suffered damages as a result of Equifax's reporting. As evidence of her damages, the Plaintiff cites her own affidavits, Dkt. No. 106-1 at 2 ("I have suffered Emotional and Actual Damages from the negative Reporting Equifax has been reporting on my credit report, and their lack of, investigating my disputes against the furnisher BMO Harris Bank"); Dkt. No. 120-1 at 3 ("I was told by a Mortgage Broker named Kevin Moore that I was denied a Mortgage Loan, from American Fidelity, because of the negative reporting by BMO Harris Bank."); Dkt. No. 130 at 5 ("I loss [sic] income and wages from the negative reporting by Equifax, as well as established and future credit, because I was told by a Mortgage Broker named Kevin Moore that I was denied a Mortgage Loan, from American Fidelity because of the

10

negative reporting by BMO Harris Bank."). None of these allegations are specific enough nor sufficiently linked to Equifax's alleged violations of the FCRA to support the Plaintiff's claims. The Plaintiff's own testimony, which she cites, further reinforces this point. *See* Dkt. No. 130 at 18 (admitting that "I'm not being able to calculate the damages"). Even the affidavit of Kevin Moore, which relates to the denial of a loan application, fails to link any alleged harm to the Plaintiff to the actions of Equifax. *See* Dkt. No. 130 at 37 ("I reviewed the credit report of Deborah Walton from Equifax, and I declined her application for a mortgage due to the late and past due payments to BMO Harris Bank."). Finally, because the Plaintiff has failed to establish that Equifax violated the FCRA, punitive damages are inappropriate. Therefore, the Court **GRANTS** Equifax's motion for summary judgment, and **DENIES** the Plaintiff's motion regarding her claims against Equifax.

### B. Claims Against BMO

#### 1. Count VI (Violation of the RESPA, 12 U.S.C. § 2605)

"RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans . . . ." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). RESPA and its implementing regulations impose certain obligations upon loan servicers in responding to a Qualified Written Request ("QWR"). *Id.* (citing 12 U.S.C. § 2605(f)). In order to succeed on her RESPA claim, the Plaintiff must establish that she suffered actual damages. 12 U.S.C. § 2605(f)(1).

The Plaintiff has made only conclusory statements regarding her alleged actual damages. *See e.g.*, Dkt. No. 63 at 7 ("The Plaintiff has been impairment [sic] by the loss of wages and impairment [sic] by the lose [sic] of credit she has established, and can continue to establish."); Dkt. No. 77 at 4 ("The Plaintiff has been impairment [sic] by the loss of wages and impairment [sic] by the lose [sic] of credit she has established, and can continue to establish."); Dkt. No. 88

11

at 8 ("BMO Harris Bank is liable to Plaintiff for actual damage [sic], statutory damages, cost and attorneys' fees."); Dkt. No. 116 at 6 ("The Plaintiff has suffered emotion [sic], economic, and financial damages, which are actual damages."); *c.f. Catalan*, 629 F.3d 676 at 693-696 (finding specific evidence of loan denials and medical records and testimony regarding emotional distress sufficient evidence of actual damages to survive summary judgment). Furthermore, even if there were evidence of harms, the Plaintiff has failed to link the alleged harms to BMO's alleged inadequate response to her QWR. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 593 (7th Cir. 2016) (affirming grant of summary judgment where the plaintiffs "failed to demonstrate the essential element that they were injured specifically by [the defendant's] inadequate response . . . under RESPA"). While the Plaintiff argues that "one of her witnesses will testify at trial that he issued the Plaintiff a denial letter, this alone will link the damages the Plaintiff suffered which is a result of BMO Harris inaccurate reporting to the credit agencies, and the negligence of Equifax," Dkt. No. 116 at 6, she does not explain how this is so. In other words, the Plaintiff fails to articulate what inaccurate information provided by BMO led to her loan application being denied. Therefore, the Court **GRANTS** BMO's motion for summary judgment on this claim, and **DENIES** the Plaintiff's motion.

2. *Count V (Violation of the FCRA, 15 U.S.C. § 1681s-2(b))*

The Plaintiff alleges that BMO "violated the FCRA 15 U.S.C. § 1681s-2(b) by failing to fully and properly investigate Plaintiff's dispute of her second mortgage representation and by failing to review all relevant information regarding the second mortgage." Dkt. No. 88 at 7. The Plaintiff further alleges that BMO "violated the FCRA 15 U.S.C. § 1681s-2(b) by failing to accurately respond to Equifax, Trans Union, and Experian." *Id*. Under the FCRA, "when a credit-reporting agency notifies a debt collector of a disputed debt, the debt collector (called a 'furnisher' under the statute) must 'conduct an investigation with respect to the disputed

information.'" *Walton v. EOS CCA*, 885 F.3d 1024, 1028 (7th Cir. 2018) (quoting 15 U.S.C. § 1681s-2(b)(1)(A)). If the furnisher[7] does not conduct a reasonable investigation after receiving notice of dispute, the debtor may have a private right of action against the debt-collector. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (implicitly recognizing such a private right). "Whether the furnisher's investigation is reasonable is a factual inquiry, but 'summary judgment is proper if the reasonableness of the defendant's procedures is beyond question.'" *Walton*, 885 F.3d at 1028 (quoting *Westra*, 409 F.3d at 827).

In support of its motion for summary judgment, BMO outlines the steps it took to conduct a reasonable investigation when receiving an Automated Credit Dispute Verification and establishes that its reporting was correct. Dkt. No. 58 at 8. In response, the Plaintiff points to an email that she received from Mary Kay D'Alessandro, a BMO employee, which read:

> Well, I was not able to do a traditional amortization schedule where the payment is fixed and the principal and interest amounts change each month. In the case of this loan, the principal amount remains fixed at $569.97/month with interest added on the loan balance at the time of the bill generation. The $569.97 was arrived at by dividing the balance of $68,396.54 (as of 4/28/16) by 120 payments. The interest rate is 5% and the interest billing is based on a 365 day year and the actual number of days in any given month.
>
> The payments are due on the 12th of the month and there is a 15 day grace period. If your payment posts on or after the 15th day, a late fee will be assessed. That would be added to the bill, making the total monthly amount higher than the standard payment. You are not required to pay the late fees shown on your billing statement at this time; they would have to be paid when the loan is paid off.
>
> I have contacted the credit correction team to shut off the reporting and remove any late payments reported since April. As I said on the phone, it takes 3 to5 business days for the bureaus to update their reports.

With regard to this email, the Plaintiff argues the following:

> if BMO had reviewed the Equity Loan Agreement that the Plaintiff signed, and if they had calculated how the payments of the Equity Loan changed, and reviewed the monthly statements starting in April 2016, along with the e-mail from Mary

---

[7] BMO concedes that it is a furnisher. Dkt. No. 26 at 6.

> Kathleen D'Alessandro (Ex. "B"; Depo. Mary Kay D'Alessandro pg. 8; ¶¶ 23-25; Ex "B")[8], which clearly outlines the Plaintiff's new scheduled payment, which had changed to $569.97 per month with interest. (Exhibit "A"; ¶ 2, Walton Aff.)[9] However if BMO Harris Bank had reviewed the current balance, actual payment and amount past due on the AUD's issued to all the credit bureaus on November 8, 2016 and November 29, 2016, BMO would have realized they made a big mistake, (AUD's, Exhibit "F"; Exhibit "G")[10], and they would not, have reported the incorrect payment amount to the Credit Bureaus from April 2016 to the current date. According to 15 U.S.C. § 1681s-2(b) the FCRA creates a private right of action for both negligent and willful noncompliance with this requirement. Gorman, 584 F.3d at 1154 (citing 15 U.S.C. §§ 1681n- 1681o). Jacobsen v Chex Sys., Inc., No. 17-cv-03435-LB, 2017 WL 3059356, 2-3 (N.D. Cal., July 19, 2017).

Dkt. No. 102 at 15 (footnotes added). The Plaintiff's argument seems to be that because Ms. D'Alessandro stated that the "principal amount [on the loan] remains fixed at $569.97/month with interest added on the loan balance at the time of the bill generation," Dkt. No. 64-2 at 2, and the subsequent AUDs state a scheduled monthly payment of $859, Dkt. Nos. 135 & 136, the numbers provided are incorrect, and because it did not realize its error, BMO must have failed to

---

[8] This citation is to deposition testimony in which the Plaintiff asks Ms. D'Alessandro if she "see[s] the Exhibit B which is an email from [D'Alessandro] to Walton. " Ms. D'Alessandro answers "Yes." Dkt. No. 101 at 16.

[9] The Plaintiff's affidavit, in relevant part, states

On or about June of 2016, I spoke to Mary Kathleen D'Alessandro and exchanged e-mails with her on several occasions, concerning my Mortgage Loan Number 3543581536, after finding out from Ms. D'Alessandro, that my monthly installment loan payment had changed on April 2016. And Mary Kathleen D'Alessandro calculated my new monthly payment, which changed from an installment payment according to the HELOC Agreement to a new fixed scheduled monthly payment of $569.97, which increased from approximately $280.00 per month to $569.97. And to the best of my knowledge the email Ms. D'Alessandro sent me with the new Fixed Monthly Payment amount was true and accurate.

This is, however, not what the email says; rather it states that the new monthly payment is $569.97 plus interest.

[10] Dkt. No. 101 at 45, 47.

14

conduct a proper investigation. However, the Plaintiff fails to provide any actual evidence regarding BMO's investigation, and points to no evidence from which a reasonable factfinder could determine that the numbers provided are incorrect. Even drawing every inference in the Plaintiff's favor, there is insufficient support for her claim. Therefore, the Court **GRANTS** BMO's motion for summary judgment, and **DENIES** the Plaintiff's motion with regard to this claim.[11]

## IV. CONCLUSION

For the reasons set forth above, the motions for summary judgment of BMO, Dkt. No. 57, and Equifax, Dkt. No. 111, are **GRANTED**. The Plaintiff's motions for summary judgment, Dkt. Nos. 100 and 104, are **DENIED**. All other pending motions are **DENIED** as moot in light of this ruling.

SO ORDERED: 8/16/18

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Copy by United States Mail to:**

**Deborah Walton**
**PO BOX 598**
**Westfield, IN 46074**

Copies to all counsel of record via electronic notification

---

[11] The Plaintiff makes the same damages arguments for both her RESPA and FCRA claims against BMO. Thus the lack of damages described with regard to the Plaintiff's RESPA claim applies similarly to the FCRA claim and is another ground for granting BMO summary judgment.

15